IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KELLY D. FANTI, individually and          :
t/d/b/a KELLY'S AUTO TAG SERVICE,         :
                                          :
    Plaintiff,                            :
                                          :
    v.                                    :          3:11-CV-01077
                                          :          (JUDGE MARIANI)
RICHARD WEINSTOCK, et al.,                :
                                          :
    Defendants.                           :

## MEMORANDUM OPINION

### I.   Introduction

Plaintiff Kelly D. Fanti, doing business as Kelly's Auto Tag Service, filed a Complaint

(Doc. 1) against Defendants Richard Weinstock, Truman Brandt, James Hankey, Susan

Wilson and Anita Wasko, pursuant to 42 U.S.C. § 1983, alleging violations of her procedural

and substantive due process rights under the Fourteenth Amendment. Presently before the

Court are cross-motions for summary judgment. For the reasons that follow, the Court will

deny Plaintiff's Motion for Summary Judgment (Doc. 30) and will grant Defendants' Motion

for Summary Judgment (Doc. 37).

### II.   Background

Plaintiff operated the vehicle service business Kelly's Auto Tag Service. (Pl.'s

Statement of Facts, Doc. 31, at ¶ 1, 8). As part of her business, Plaintiff entered into

agreements with the Pennsylvania Department of Transportation ("PennDOT"). (Id. at ¶¶ 8-

9). These agreements included a Messenger Services Agreement, authorizing her to deliver

and obtain "driver licensing and vehicle registration documents to and from PennDOT for

consumers in Pennsylvania," and an Agent Services Agreement, which enabled her to issue

and process "temporary registration cards, plates, permits or other similar products

designated by PennDOT." (Def's Statement of Mat. Facts, Doc. 38, at ¶¶ 8-10).

  "As part of their agreement with PennDOT, Agents and Messengers are subject to

being audited and inspected by PennDOT." (*Id*. at ¶ 11). "A typical audit involves looking at

files to make sure the paperwork for the past three years is kept in chronological order, the

records of different documents are there (e.g. MV4's, MV-1's and MV 120's), and the

paperwork is being submitted in time." (*Id*. at ¶ 15). "These audits and inspections may be

performed by authorized Commonwealth employees or designees, including the

Pennsylvania State Police ['PSP']." (*Id*. at ¶ 11).

  Beginning around late 2008, Defendant Richard Weinstock, a PSP Trooper, (*id*. at ¶

2), had encounters with motorists that led him to suspect Kelly's Auto Tag Service was not

properly issuing vehicle registrations, (*see* Weinstock Dep., Defs.' Ex. 4, Doc. 39-6, at 10:8-

23:7). On more than one occasion between late 2008 and early 2009, "Weinstock appeared

at Kelly's Auto Tag Service." (Doc. 31 at ¶¶ 10-11, 13). During one of these visits, one

"Kellan Lukowich was present . . . and observed/heard Weinstock." (*Id*. at ¶ 15). According

to Lukowich, Weinstock "threatened to close [Fanti] down permanently," while Fanti "sat

an[d] listened while the Trooper vented several times in front of everyone." (*Id*. at ¶ 17).

Weinstock subsequently submitted two complaints about Kelly's Auto Tag Service arising out of this background to Defendant Truman Brandt, a member of the PSP's Vehicle Fraud Investigation Unit. (*Id.* at ¶¶ 19, 22).

As a result of Weinstock's complaints—and another complaint submitted by one David Jackson—"Trooper Brandt, accompanied by [Defendant] Trooper [James] Hankey, conducted an audit of Kelly's Auto Tag on June 17, 2009." (Doc. 38 at ¶¶ 13, 16). The audit revealed "numerous irregularities in the records – including records not being kept in chronological order, titles that were completed but not notarized, and applications which had never been sent into PennDOT." (*Id.* at ¶ 16). "Brandt identified 218 original MV-4 applications which had not been completed properly." (*Id.* at ¶ 17). Following the audit, Brandt "contacted Wilson, the Manager of the Regulated Client Services Section for PennDOT, and informed her that there were a large number of applications that had not been submitted to PennDOT in the required time frame." (*Id.*).

Acting under the direction of her supervisor, Wilson called "Trooper Brandt back the same day and told him that PSP should take possession of the applications." (*Id.* at ¶ 18).[1] According to Defendants, "[t]he applications were taken because they are the property of PennDOT, they were evidence that Fanti was not following regulations, and it was important to try and fully process all outstanding applications as members of the general public were

---

[1] Plaintiff denies Paragraph 18 of Defendants' Statement of Facts. (Pl.'s Answer to Defs.' Statement of Facts, Doc. 44, at ¶ 18). However, her response does not appear to deny the portion of testimony cited above, given that she admits that "Brandt confiscated all of the applications-in-progress from Plaintiff's business." (*Id.*)

relying on the assumption that the applications had already been delivered to PennDOT."

(*Id.*). Examination of the seized applications revealed that there "were 218 registration

applications and unpaid fees totaling $42,201.64 which had never been delivered to

PennDOT." (*Id.* at ¶ 19). Based on this information, "Brandt believed that Plaintiff had

committed a fraudulent act" and "communicated this belief to PennDOT." (Doc. 31 at ¶¶ 26-

27).

Wilson forwarded the findings of the audit to her supervisor with her recommendation

that Plaintiff's Agent and Messenger Agreements be terminated. (Doc. 38 at ¶ 19). On June

23, 2009, PennDOT faxed Plaintiff two correspondences, signed by Defendant Anita Wasko,

Director of the Pennsylvania Department of Motor Vehicles, (*id.* at ¶ 6), indicating that

PennDOT was immediately terminating her Messenger and Agent Agreements. (Doc. 31 at

¶¶ 29-32). The correspondences stated, in pertinent part, that the terminations of both

Agreements were

for the following violation(s)[:]

. . . The agent service, one of its owners, officers or employees, has
committed a fraudulent act including the fraudulent keeping of records, or the
fraudulent completion of an application submitted to the Department, or has
failed to submit to the Department completed applications and fees and taxes
due the Commonwealth in connection with the issuance of the temporary
cards or plates.

(*Id.* at ¶¶ 30, 32).

The June 23, 2009 termination letters stated, in accordance with the Agent and

Messenger Agreements, that Plaintiff had five business days to "request a meeting with the

4

Department to present mitigating circumstances or factors." (*See* Pl.'s App., Doc. 33, at 13a, 40a (Messenger and Agent Agreements, respectively); 49a, 51a (termination orders of respective Agreements). Such a meeting was held on August 3, 2009. (PSOF at ¶ 38).

On November 10, 2009, the Pennsylvania Commonwealth Court issued *Moore v. Department of Transportation*, 989 A.2d 49 (Pa. Commw. Ct. 2009). *Moore* discussed the correct interpretation to be accorded to Pennsylvania's Act 152 of 2002, P.L. 1278, ("Act 152" or "the Act"), which "amended the requirements for agent and messenger services." *Id.* at 50.

It summarized the background of the Act as follows:

> Previously under the Department's regulations, persons who wished to perform agent or messenger services first had to obtain a license to do so from the Department and were required to display this license on their premises. The Department was required to provide an opportunity for a hearing before imposing suspensions or sanctions upon an issuing agent for violations such as committing a fraudulent act, keeping fraudulent records or fraudulently completing an application. However, Act 152 of 2002 amended the requirements for agent and messenger services and Section 7501 of the Vehicle Code, 75 Pa. C.S. § 7501, now states, "The department shall enter into *contracts* for messenger and agent services" and "No person shall operate a messenger or agent service without a valid *contract.*" In addition, Section 7502.1 of the Vehicle Code, 75 Pa. C.S. § 7502.1, now states "Regulations pertaining to messengers and agents regarding the amount of a bond, hearings, written warnings, suspensions, revocations or fines shall not apply to messengers and agents who enter into contracts with the department to provide messenger or agent services." Section 7503 of the Vehicle Code, 75 Pa. C.S. § 7503, which provided for an appeal from suspension of an agent's messenger services certificate, was deleted.

*Id.* This statutory background led to certain confusion: namely, that the change of language from "licenses" to "contracts" could be construed as implying that Agent and Messenger Agreements were no longer entitled to due process protection.

However, the *Moore* court construed the Act to the contrary. "[D]espite the use of the term 'contract' in Act 152," it decided "that agent and messenger service agreements are truly licenses" which "may not be suspended or revoked without due process." *Id.* at 51-52. As such, "any adverse action of the agency is appealable." *Id.* at 51.

This was an important decision for Fanti's case. By clarifying that the very Agreements whose termination Fanti contested were actually licenses entitled to traditional due process protection, the decision in *Moore* afforded Fanti greater protection than she appeared to have been entitled to before that decision was issued.

Nonetheless, at the time that *Moore* was issued, Fanti was still waiting for a decision on the August 3 meeting that PennDOT offered her in the pre-*Moore* legal landscape. Apparently tired of waiting, Plaintiff's counsel sent PennDOT a letter on March 12, 2010 requesting that her Agent and Messenger Agreements be reinstated in light of the mitigating circumstances discussed during the August 2009 meeting. (Doc. 33 at 55a-56a). On April 23, 2010, PennDOT responded with letters stating that it would not amend its initial termination decisions and that Plaintiff had thirty days to request an administrative appeal—

a right to which it likely would have claimed she was unentitled prior to *Moore*.[2] (*Id.* at 57a-

58a). Fanti did file an administrative appeal on April 23, 2010. (DSOF at ¶ 31 (citing Defs.'

Exs. Q, R, Doc. 39-3)). PennDOT received Plaintiff's request for an appeal on April 26,

2010, and a hearing "was held before Andrew [C]line, a Department Hearing Officer, on July

29, 2010." (*Id.* at ¶ 32; Defs.' Exs. Q, R).

On November 17, 2010, Hearing Officer Cline issued an eight-page Proposed Report

in connection with the hearing, which included findings of fact and conclusions of law. (*Id.* at

¶ 34).[3] In discussing Plaintiff's argument that PennDOT violated her due process rights, the

Report states:

> Here, Fanti was deprived of her agent and messenger status immediately
> upon notice of the Bureau's charges, before her due process "hearing" or
> meeting. While I do believe that the Bureau's pre-process termination was
> justified by an important governmental interest (protecting the public and
> applicants with pending paperwork) and accompanied by a substantial
> assurance that the deprivation was not baseless (the State Police audit), I am
> not sure her post-deprivation process was "reasonably prompt". By the
> contractual standard, it is apparent that the Bureau did not provide a timely
> meeting as required under the contract because the meeting was 40 days
> after termination. It is also troubling that it took the Bureau eight months after
> the meeting to issue its decision not to modify the sanction.

(Doc. 31 at ¶ 55).

The Report recommended that the terminations of Plaintiff's Agent and Messenger

Agreements be reduced to suspensions "for a period equal to time served under the orders

---

[2] In *Moore*, PennDOT specifically argued that these Agreements were contracts unentitled to any due process protection. *See Moore*, 989 A.2d at 51.

[3] Plaintiff denies this assertion in Defendants' Statement of Facts. (Doc. 44 at ¶ 34). However, her denial pertains only to Defendants' perceived interpretation of the contents of the report. It does not appear that Plaintiff denies the proposition that a report was in fact issued on this date.

of termination, plus 30 days"—i.e., for a total of eighteen months. (Doc. 31 at 71a-72a; Doc. 38 at ¶ 34). "Neither PennDOT nor Fanti filed exceptions or appealed the Hearing Officer's decision. Accordingly, the Hearing Officer's Report became final." (Doc. 38 at ¶ 36).

## III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's,

8

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. <u>Analysis</u>

### A.   Due Process Clause

"In order to establish a *prima facie* case under § 1983, a plaintiff must demonstrate that: '(1) a person deprived her of a federal right and (2) the person who deprived her of that right acted under state or territorial law.'" *Burrella v. City of Philadelphia,* 501 F.3d 134, 139 (3d Cir. 2007) (quoting *Groman v. Twp. Of Manalapan,* 47 F.3d 628, 633 (3d Cir. 1995)) (internal alterations omitted). "Notwithstanding its broad language section 1983 does not create substantive rights; rather it merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Estate of Smith v. Marasco,* 318 F.3d 497, 505 (3d Cir. 2003).

Here, Plaintiff alleges violations of her substantive and procedural due process rights under the Fourteenth Amendment. (Compl. at p. 7). These alleged violations are styled as one single claim, for violations of "Procedural and Substantive Due Process." (*See* Compl., Doc. 1, at 7.) As the Supreme Court has stated,

> We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S. Ct. 2963, 2976, 41 L. Ed. 2d 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, *see, e.g., Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S. Ct. 1983, 1995, 32 L. Ed. 2d 556 (1972) (the procedural due process guarantee protects against "arbitrary

9

takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, *see, e.g., Daniels v. Williams*, 474 U.S. [327,] 331, 106 S. Ct. [662,] 664[, 88 L. Ed. 2d 662 (1986) (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S. Ct. 1708, 1717, 140 L. Ed. 2d 1043 (1998). Thus, to the extent that Plaintiff challenges the procedures by which she was allegedly deprived of her property interests, she raises a procedural due process claim. On the other hand, to the extent that she alleges that the Defendants used government power "for the purposes of oppression," regardless of the fairness of the procedures by which they used it, *see Daniels*, 474 U.S. at 331, 106 S. Ct. 665, she states a substantive due process claim.

Plaintiff's aggregated "Due Process" claim, however, is alleged against two discrete sets of Defendants: the PSP Defendants (Troopers Richard Weinstock, Truman Brandt, and James Hankey) and the PennDOT Defendants (PennDOT Regulated Client Services Section Manager Susan Wilson[4] and Director of Bureau of Motor Vehicles Anita Wasko). Therefore, the Court must note at the outset that, though the Count is styled as against all Defendants, only the substantive due process portion of Plaintiff's claim could conceivably apply to them all. The procedural due process portion can by its own terms only apply to the PennDOT Defendants, because only PennDOT had control over the procedures by which

---

[4] Susan Wilson is not named in the heading of the Due Process Count. (*See* Compl. at p. 7.) However, because she is elsewhere listed as a Defendant, and because there are no other Counts in which she could be named, the Court interprets this as mere typographical error.

Plaintiff was deprived of her property interest in her business. The Court believes that it is clear that the Pennsylvania State Police generally do not have any personal involvement in the decision as to whether PennDOT will terminate its own Agent or Messenger Agreements, nor is there any evidence that they had such involvement in this case.

The Court therefore proceeds to analyze the substantive due process claim against all Defendants and the procedural due process claim against the PennDOT Defendants only. There is no dispute that all of the Defendants acted under color of state law.

### 1. *Procedural Due Process*

In order to succeed on a claim for deprivation of procedural due process rights, a plaintiff must show "that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 (3d Cir. 2013).

As to the first issue, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576, 92 S. Ct. 2701, 2708, 33 L. Ed. 2d 548 (1972). "To have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it." *Id.* at 577. This entitlement is established by "the existing rules or understandings that stem from an independent source such as state

law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

Here, the PennDOT Defendants concede "that Fanti had a property interest in her Agent Services Agreement and her Messenger Services Agreement which implicates a property interest under Pennsylvania state law." (Defs.' Mem. in Supp. of Mot. for Summ. J., Doc. 40, at 9-10). As *Moore* made clear, Agent and Messenger Agreements are equivalent to business licenses. *See Moore*, 989 A.2d at 51. A "'license, once obtained by compliance with law, becomes a valued privilege or right in the nature of property, which may not be suspended or revoked without due process.'" *Marin v. McClincy*, ___ F. Supp. 2d ___, 2014 WL 1415222, at *5 (W.D. Pa. 2014) (quoting *Balfour Beatty Constr. Inc. v. Dept. of Transp.*, 783 A.2d 901, 908 (Pa. Commw. Ct. 2001)).

The main dispute in this case is therefore whether Plaintiff was offered constitutionally adequate process in connection with the deprivation of her property interests. "Once it is determined that due process applies, the question remains what process is due. It has been said . . . often by [the Supreme] Court and others . . . that due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972).

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

12

additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18 (1976).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333, 96 S. Ct. at 902 (internal quotation marks omitted).

Upon a review of the factual record in this case, the Court cannot agree with Plaintiff that the procedures she was afforded violated due process.

As discussed in more detail above, Defendant Brandt commenced an audit of Plaintiff's business on June 16 or 17 after receiving complaints from Weinstock and another person. (Doc. 31 at ¶¶ 22-23; Doc. 38 at ¶ 13). During the audit, he discovered "numerous irregularities in [Plaintiff's] records" and "218 original MV-4 applications which had not been completed properly" and were overdue to be submitted to PennDOT. (Doc. 38 at ¶¶ 16-17, 19-20). The applications involved $42,201.64 in unpaid fees which had never been delivered to PennDOT. (*Id.* at ¶ 19).

At this time, *Moore* had not been decided, so it is somewhat unclear whether "existing state-law rules or understandings" gave Plaintiff a property interest in her business on June 23. However, the Court need not determine the status of such existing "understandings," because the Supreme Court has held that in certain circumstances "the State is entitled to impose an interim suspension, pending a prompt judicial or administrative

hearing that would definitely determine the issues, whenever it has satisfactorily established probable cause to believe that" certain infractions occurred, without providing a predeprivation hearing. *See Barry v. Barchi*, 443 U.S. 55, 64, 99 S. Ct. 2642, 2649, 61 L. Ed. 2d 365 (1979). Clearly, the fact that the audit produced evidence of possibly hundreds of infractions provides probable cause to believe that those infractions occurred. *Cf. United States v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990) ("Probable cause exists where the facts and circumstances within [an] officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the [suspect]."). Thus, even assuming *arguendo* that the deprivation of property began on June 23, the Court finds that "an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues" was appropriate in this case. While Fanti undoubtedly has a strong interest in operating her business, the Commonwealth also has a strong interest in maintaining the integrity of its vehicle registration system and in ensuring that customers who come to registered agents of the Commonwealth have their registrations processed according to the law. Moreover, the risk of erroneous deprivation is relatively low, so long as the Plaintiff is allowed the requisite judicial or administrative hearing within a short period of time.

And indeed, the Commonwealth did offer a prompt hearing. The summary judgment record reflects that the Messenger and Agent Agreements were terminated on June 23, 2009, a few days after the audit. (*See* Doc. 31 at ¶¶ 29, 31; Doc. 38 at ¶¶ 25-

26). The record further reflects that Plaintiff's attorney sent a letter to PennDOT on June 26 requesting a meeting to address the issues in the termination letters. (*See* Letter of Joseph Saporito, Jr., Doc. 39, Ex. K). In that letter, Plaintiff's attorney further stated that he "will be unavailable the entire week of July 13, 2009." (*Id.* at 1). Ultimately, the parties PennDOT held the requested meeting on August 3, 2009. (Doc. 31 at ¶ 38). Thus, excluding the time that Plaintiff's attorney was unavailable—a scheduling issue for which PennDOT cannot be held responsible—only 34 days elapsed between the date that the termination letters were sent and the date that the meeting was held. This 34 day delay cannot be considered unreasonable for constitutional due process purposes under *Barry* or *Mathews*, especially considering the clear presence of probable cause that Plaintiff committed the alleged violations.

However, Plaintiff goes on to argue that "it wasn't until April 23, 2010, almost nine (9) months later," that PennDOT actually reached a decision on this meeting and decided to continue the suspension of Plaintiff's Agreements. (Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J., Doc. 45, at 12; *see also* Doc. 31 at ¶¶ 40-43). According to the Defendants, Susan Wilson "was unable to determine why PennDOT failed to send notification to Fanti before that time." (Doc. 38 at ¶ 30).

Until *Moore* was decided, it appeared that Pennsylvania law did not provide for any more hearings than this. However, the PennDOT decision was released after *Moore*

held (on November 10, 2009) that Agent and Messenger Agreements, being licenses rather than contracts, entitled agents to due process protections, including a right to appeal their termination. Therefore, following PennDOT's April 23 decision, Plaintiff filed an administrative appeal, and a hearing was held before a PennDOT Hearing Officer on July 29, 2010. (Doc. 38 at ¶¶ 31-32). The Hearing Officer did not issue a decision until November 17, 2010. (Doc. 31 at ¶ 53).

This means that—assuming that the time of deprivation began to run on June 23 and not on the date that *Moore* was decided—Plaintiff's Agreements were suspended for a total of approximately seventeen months before a final decision. On the other hand, if it was *Moore* that established the state-law "rules and understandings" entitling Plaintiff to a due process hearing, she was only deprived of a property interest for approximately one year.

The Court cannot find, however, that a deprivation lasting as long as seventeen months constitutes a violation of due process.

> In determining how long a delay is justified in affording a post-suspension hearing and decision, it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by the delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.

*Fed. Deposit Ins. Co. v. Mallen*, 486 U.S. 230, 242, 108 S. Ct. 1780, 1788, 100 L. Ed. 2d 265 (1988) (citing *Barry* 443 U.S. at 66, 99 S. Ct. at 2650). It is significant that the Third

16

Circuit previously held that a *twenty-month* delay between deprivation and hearing did not

violate a plaintiff's due process rights. *Ritter v. Cohen*, 797 F.2d 119, 123-24 (3d Cir. 1986).

In *Ritter*, the Pennsylvania Department of Public Welfare terminated a physician's contract

to perform services for Medicaid recipients. *Id.* at 120. "[N]inety-nine percent of [Ritter's]

medical practice consist[ed] of patients eligible for Medicaid reimbursement." *Id.* at 123.

Despite this, the Circuit stated that a potential twenty-month delay was insufficient to state a

procedural due process claim, where there were no allegations of indigence or any

contention that the plaintiff had no "other potential sources of support." *Id.* at 124. The

Circuit noted other instances in which unintentional delays of comparable lengths were

found to be insufficient to establish a procedural due process violation. *See id.* at 124 (citing

*Givens v. U.S. R.R. Ret. Bd.*, 720 F.2d 196, 201 (D.C. Cir. 1983) (nineteen-month delay in

adjudicating appeal of denial of railroad benefits does not violate due process, where

plaintiff offers no evidence of intentional delay); *Frock v. U.S. R.R. Ret. Bd.*, 685 F.2d 1041,

1047 (7th Cir. 1982) (two-year delay in adjudicating appeal does not violate due process);

*Kelly v. R.R. Ret. Bd.*, 625 F.2d 486 (3d Cir. 1980) (period of three years and nine months to

process disability application from initial application through administrative appellate review

*does* violate due process)); *see also Hassel v. Neal*, 1997 WL 269575, at *2 n.4 (E.D. Pa.

1997) ("The record does not reflect the reason for the delay in the arbitration proceeding.

However, without allegations of deliberate delay or of plaintiff's indigency, the 14-month

period from dismissal [from public employment] to arbitration decision does not amount to a

due process violation.").

The Court cannot find that the present case, which involves shorter delays than

those cited, is any different than those others. Though PennDOT's unexplained delay

between August and April is unfortunate, there is no evidence that it was done intentionally

or maliciously. Indeed, after Plaintiff's attorney notified PennDOT of the delay, PennDOT

issued a decision with relative promptness. (See Doc. 38 at ¶ 30). Again, while Plaintiff

undoubtedly has an interest in her Agreements with PennDOT, there is no evidence of

record to suggest that that interest is any stronger than those of the other plaintiffs whose

delays of greater length the Third Circuit and others have found not to constitute a violation

of due process.Additionally, "the likelihood that the interim decision could have been

mistaken" also weighs against finding the delay unreasonable. As discussed above,

PennDOT took 218 unfiled registration applications from Plaintiff's business. The fact that

Plaintiff had not been filing these applications was a significant part of the charges against

her. Therefore, the fact that hard evidence of the charges leading to a termination of the

Agreements existed in PennDOT's possession makes it very unlikely that the interim

decision would be later found to be mistaken. Plaintiff herself essentially admitted as much

later, at her full due process hearing when she "admitted in her testimony that she had

violated the terms of her Agreements with PennDOT and had failed to comply with

applicable regulations by not submitting applications and money owed to PennDOT in a

timely manner" and based her defense only an arguments "that there were mitigating

circumstances." (Doc. 38 at ¶ 33). Again, the fact that Plaintiff herself admits that she

engaged in the violations complained of indicates that it was unlikely that the interim

decision suspending her Agreements would have been found to be mistaken, even if

mitigating circumstances might alter the severity of the sanctions imposed.

Finally, an examination of "the importance of the private interest and the harm to this

interest occasioned by the delay" also weighs in favor of finding the delay not

unconstitutional. While, as discussed above, the private interest is certainly important, there

was no actual harm occasioned by the delay. The Hearing Officer's November 17, 2010

Report ordered that Plaintiff's Agreements be "suspended for a period equal to the time

served under the orders of termination, plus 30 days." (Proposed Report of Dep't Hearing

Officer Andrew H. Cline, November 17, 2010, Doc. 33, at 72a). This means that Plaintiff's

suspension lasted for only one month longer than the time of delay. Accordingly, any period

of delay counted as "time served" and ultimately did not lengthen Plaintiff's period of

suspension. While it is true that if the hearing were held sooner and the Hearing Officer

decided to give the same suspension of "time served plus thirty days," Plaintiff would have

served a shorter suspenson, the Hearing Officer's conclusion is ultimately based on what he

found to be the appropriate time of suspension "considering all the circumstances of this

matter." (*Id.* at 71). Thus, it is equally likely that, if Plaintiff had endured less "time served,"

the Hearing Officer would simply have added more time to her suspension, so that the

ultimate sanction was roughly equal to the one he found appropriate under all

circumstances. But, putting aside such speculation, the fact that Plaintiff's final, retroactive

suspension was for a longer period than her actual delay at the very least weighs in favor of

a finding that the delay caused her little harm.

Therefore, Plaintiff cannot sustain her procedural due process claim.

### 2.    Substantive Due Process

A claim for a violation of the substantive due process clause may lie when a

government official engages in "an abuse of executive power so clearly unjustified by

any legitimate objective of law enforcement as to be barred by the Fourteenth

Amendment." *Cnty. of Sacramento*, 523 U.S. at 840, 118 S. Ct. at 1713.

> To establish a substantive due process claim, a plaintiff must prove the
> particular interest at issue is protected by the substantive due process clause
> and the government's deprivation of that protected interest shocks the
> conscience.

*Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008).

"Ownership is a property interest worthy of substantive due process protection."

*DeBlasio v. Zoning Bd. of Adjustment for Twp. of W. Amwell*, 53 F.3d 592, 600 (3d Cir.

1995). Nonetheless, to turn Fanti's deprivation of her property into a substantive due

process claim, she must still show that the deprivation shocks the conscience, a standard

which "encompasses 'only the most egregious conduct.'" *Chainey*, 523 F.3d at 219 (quoting

*United Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003)).

"While the meaning of the [shocks-the-conscience] standard varies depending upon factual

context, merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision." *Id.* at 220.

The essence of Plaintiff's substantive due process claim is that "Weinstock appeared at Plaintiff's place of business on at least three (3) separate occasions[,] threatened to close her down on at least two (2) of those occasions . . . and did, in fact, summarily close her business [after the third visit], without notice, hearing or court adjudication." (Doc. 45 at 13). She also briefly asserts a damage to her "reputational liberty interests," (*id.* at 14), which is cognizable under the substantive due process clause, *see Ersek v. Twp. of Springfield*, 102 F.3d 79, 83 (3d Cir. 1996).

The first issue cannot support a substantive due process claim. As discussed above, there was probable cause to believe that Plaintiff's was in violation of her Agent and Messenger Agreements, and therefore also in violation of the Pennsylvania Vehicle Code. The PSP Defendants' actions in taking steps to shut down Plaintiff's business, then, far from constituting a violation of substantive due process, were the legitimate acts of law enforcement officers, which were ultimately sustained by the PennDOT hearing officer. Merely carrying out the duties of a law enforcement officer is not "egregious" conduct sufficient to sustain a substantive due process violation. And while Weinstock's comments that he would "shut down" Fanti's business may have been intemperate, they surely do not constitute "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment." *Cf. also Sweetman v.*

21

*Borough of Norristown*, 554 F. App'x 86, 90 (3d Cir. 2014) ( "[M]ere verbal threats do not provide the basis for a viable § 1983 claim.")

Nor can a substantive due process claim lie against the PennDOT Defendants. As discussed in the preceding section, there was nothing procedurally unconstitutional in the process that Plaintiff was afforded after her Agreements were terminated. And while Plaintiff does not particularly specify the basis of her substantive due process claim against these Defendants, the only misconduct alleged against them relates to the various alleged delays in the due process hearings. But if these delays do not amount to procedural due process violations, then they surely cannot amount to substantive due process violations, which contain the heightened requirement of shocking the conscience.

Finally, Plaintiff briefly mentions her liberty interest in her reputation. "For government action to infringe the 'reputation, honor, or integrity' of an individual, that government action first must involve a publication that is substantially and materially false." *Ersek*, 102 F.3d at 83-84. "Assuming all of the other elements necessary to make out a claim of stigmatization . . . the remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the charge.'" *Codd v. Velger*, 429 U.S. 624, 627, 97 S. Ct. 882, 883-884, 51 L. Ed. 2d 92 (1977) (quoting *Roth*, 408 U.S. at 573, 92 S. Ct. at 2707). Actions that harm a plaintiff's reputation which are made in the regular course of government operations are not actionable under the Due Process Clause unless the defendants acted out of some kind of ill will. *See Bishop v. Wood*, 426 U.S. 341, 350, 96 S. Ct. 2074, 2080, 48 L. Ed. 2d

684 (1976) ("In the absence of any claim that the [government official] was motivated by a desire to curtail or to penalize the exercise of [a plaintiff's] constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways.").

Here, there is no evidence that any harm to Plaintiff's reputation was motivated by ill will. Moreover, to the extent that the remedy for deprivations of a liberty interest in one's reputation is a name-clearing hearing, Plaintiff received such a hearing on July 29, 2010, which the Court already found to comply with procedural due process. However, far from using the hearing to clear her own name, Plaintiff actually admitted there to the conduct alleged. It is therefore clear that Plaintiff cannot make out a substantive due process claim for reputational harm, against either the PSP or the PennDOT Defendants.

Therefore, Plaintiff cannot sustain her substantive due process claim.

### B.    Qualified Immunity

As discussed above, the Court finds reason to grant Defendants summary judgment on the merits of Plaintiff's procedural and substantive due process claims. But even if this were not the case, the doctrine of qualified immunity would also afford Defendants an independent basis for the grant of summary judgment in their favor.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v.*

*Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting *Harlow*

*v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). Qualified

immunity serves the dual purpose of holding government officials accountable when their

power is exercised irresponsibly and protecting officials from "harassment, distraction, and

liability when they perform their duties reasonably." *See id.* "[Q]ualified immunity applies

regardless of whether the government official's error is 'a mistake of law, a mistake of fact,

or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540

U.S. 551, 567, 124 S. Ct. 1284, 1295, 157 L. Ed. 2d 1068 (2004) (Kennedy, J., dissenting)).

In deciding whether to grant qualified immunity, the Court must consider two

questions: First, "[t]aken in the light most favorable to the party asserting the injury, do the

facts alleged show the [official's] conduct violated a constitutional right?" *Saucier v. Katz*,

533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Second, "if a violation

could be made out on a favorable view of the parties' submissions, the next, sequential step

is to ask whether the right was clearly established." *Id.* For all the reasons discussed in the

section on due process, the first *Saucier* prong would justify qualified immunity, because no

violations of constitutional rights have been shown. But even if such a violation were shown,

qualified immunity would still attach because the rights that Plaintiff asserts were not clearly

established until *Moore* was decided months after Plaintiff's Agreements were terminated.

For a right to be "clearly established," it need not be the case that "'the very action in

question has previously been held unlawful.'" *McGreevy v. Stroup*, 413 F.3d 359, 366 (3d

Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666

(2002)). Rather, it need only be true that, in the context of preexisting law, "the unlawfulness

of the official's conduct was reasonably and objectively apparent." *Id.* (citing *Wilson v.*

*Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 1699, 143 L. Ed. 2d 818 (1999)). The "salient

question" is "whether the state of law [at the time of the incident] gave [the officials] fair

warning" that their actions were contrary to the law. *See Hope*, 536 U.S. at 741, 122 S. Ct.

at 2516.

Before *Moore* was decided on November 10, 2009, it was not at all clear that an

agent whose Agent and Messenger Agreements had been terminated was entitled to any

kind of due process protection. *Moore* itself discusses the source of this confusion. Briefly,

the confusion comes from the fact that, whereas under previous PennDOT regulations,

"persons who wished to perform agent or messenger services first had to obtain a license to

do so from the Department and were required to display this license on their premises," this

rule was amended by Act 152 of 2002, which described Agent and Messenger Agreements

not in terms of *contracts*, but instead in terms of licenses. *Moore*, 989 A.2d at 50. This

caused PennDOT to argue in *Moore* that, because "no one has a personal or property right

to a contract," terminated agents are "not entitled to any due process protections, such as a

hearing, before its agent and messenger services were terminated." *Id.* at 51. Though the

Commonwealth Court ultimately rejected this argument—and thereby clarified the law—it

did not do so until Plaintiff's Agreements had been terminated for approximately four and a

25

half months. Moreover, once *Moore* clarified the law, PennDOT afforded Plaintiff her due process hearing relatively soon after its April 23 decision terminating the Agreements made such an appeal to a hearing officer timely.

In short, the Defendants acted within a reasonable interpretation of an unclear area of the law as that law evolved. They never acted in a way that could be deemed "an objectively apparent" violation of clearly established law. Therefore, Defendants are entitled to qualified immunity.

## V. Conclusion

For the foregoing reasons, the Court Plaintiff's Motion for Summary Judgment (Doc. 30) is **DENIED** Defendants' Motion for Summary Judgment (Doc. 37) is **GRANTED**. A separate Order follows.

Robert D. Mariani
United States District Judge